1  Peter C. Ward, Esq.          SBN 126459
2  Christopher H. Hagen, Esq.   SBN 179529
   Steven M. Nuñez, Esq.        SBN 185421
3  **WARD & HAGEN, LLP**
   440 Stevens Avenue, Suite 350
4  Solana Beach, California 92075
   Telephone:    (858) 847-0505
5  Facsimile:    (858) 847-0105

6

7  *Attorneys for Plaintiffs Ramiro Giron Nicolas J. Hererra*
   *and Orlando Antonio Mendez.*

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

| RAMIRO GIRON, NICOLAS J. HERRERA, ORLANDO ANTONIO MENDEZ, on behalf of themselves and a class of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> HONG KONG AND SHANGHAI BANK COMPANY, LTD, a foreign company; HSBC BANK USA, N.A., a national banking association; and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **Counts:** <br> **1. Aiding and Abetting Fraud;** <br> **2. Aiding and Abetting Breach of Fiduciary Duty;** <br> **3. Aiding and Abetting an Endless Chain Scheme, C.C.P. §1689.2;** <br> **4. Violation of 18 U.S.C. §1961 et seq. (RICO); and,** <br> **5. Violation of California Business and Professions Code §§17200** *et seq.* |
|---|---|

Plaintiffs, Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez, in their individual and representative capacities and on behalf of a class of all similarly situated, by and through their undersigned attorneys allege as follows

### INTRODUCTION

1.      Phil Ming Xu and the companies he controlled, World Capital Markets, Inc., and affiliates, WCM777 Inc., WCM777 Ltd., dba WCM777 Enterprises, Inc., Kingdom Capital Market,

1

1  LLC, Manna Holding Group, LLC, Manna Source International, Inc., WCM Resources, Inc., To

2  Pacific, Inc., Agape Technology Ltd., and their subsidiaries and affiliates (collectively "WCM777"),

3  perpetrated a Pyramid/Ponzi scheme that scammed victims out of millions of dollars.

4      2.    Defendant HSBC Hong Kong was instrumental in helping WCM777 to continue its

5  Pyramid/Ponzi scheme even as state and federal authorities were shutting it down in the United States.

6  Defendant HSBC Hong Kong allowed WCM777 to transfer receipt of U.S. wire transfers from

7  investors to accounts in Hong Kong while state after state were issuing cease and desist orders.

8  Defendant HSBC Hong Kong even refused to shut down the WCM777 accounts, or otherwise

9  cooperate, after the Federal District Court issued retraining orders freezing its accounts and appointing

10  a Receiver for WCM777, and, instead, allowed WCM777 to transfer the millions of dollars that were

11  in the HSBC accounts.

12  **JURISDICTION AND VENUE**

13      3.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of

14  2005, 28 U.S.C. §§ 1332(a) and 1332(d), because there are more than 100 class members nationwide ,

15  at least one class member is of diverse citizenship from one Defendant, and the aggregate amount in

16  controversy exceeds $5,000,000 exclusive of interest and costs.

17      4.    This Court also has subject matter jurisdiction pursuant to the Rackateer Influenced

18  and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

19      5.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part

20  of the events or omissions giving rise tot the claims in this action occurred in this judicial District,

21  because WCM777 may be found within this judicial District, and the SEC which has led investigation

22  of WCM777 is located within this judicial district.

23      6.    This Court has personal jurisdiction over Defendants because certain of them have

24  business operation in this stte, while others have sufficient minimum contacts with the state, and

25  otherwise intentionally avail themselves of the markets of this state so as to render this Court's

26  exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

27  **PARTIES**

28      7.    Plaintiff Ramiro Giron is an individual who resides in Oakland, California.

8.      Plaintiff Nicolas J. Herrera is an individual who resides in Daly City, California.

9.      Plaintiff Orlando Antonio Mendez is an individual who resides in Yuba City, California.

10.     Defendant HONG KONG AND SHANGHAI BANKING CORPORATION LIMITED "HSBC Hong Kong"), is a Hong Kong Corporation with its principal place of business in Hong Kong, China.

11.     Defendant HSBC BANK USA, N.A., ("HSBC USA") is a federally chartered bank, with its headquarters in Mclean, Virginia, and its principal place of business located in New York, NY.  Defendant HSBC USA is registered with the California Secretary of State and regularly transacts business in California.

12.     Defendants DOES 1 through 100, inclusive, whether individual, corporate, associate, alter ego, or otherwise, are fictitious names of Defendants whose true names and capacities, at this time, are unknown to Plaintiffs; Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, each Defendant sued herein as a DOE was acting for itself or its agent, servant, employee, and/or alter ego of its Co-Defendants, and in doing the things hereinafter mentioned, was acting in the course and scope of its authority as such agent, servant, employee, and/or alter-ego, and with the permission and consent of its Co-Defendants; and that each of said fictitiously named Defendants, whether acting for itself or as agents, corporations, associations, or otherwise, is in some way liable or responsible to Plaintiffs on the facts hereinafter alleged, and caused injuries and damages proximately thereby, as hereinafter alleged, and at such times as Defendants' true names and capacities become known to Plaintiffs, Plaintiffs will ask leave of this court to amend this Complaint to insert said true names and capacities.

13.     Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, Defendant and DOES 1 through 100, inclusive, and each of them, were acting as agents, servants, alter egos, and employees of each other, and were acting within the full course and scope of their agency, servancy, and employment, with the full knowledge and consent, either expressed or implied, of either of the other Defendants and DOES 1 through 100, inclusive, and each of them. (Defendants and DOES 1-100, inclusive, and each of them are hereinafter collectively referred to

herein as "Defendants").

14.     Plaintiffs are informed and believe and thereupon allege that at all times relevant herein, Defendants and each of them were and are inadequately capitalized and have no genuine or separate existence, but were and are used and are existing for the sole purpose of permitting the other Defendants to transact a portion of their business under a separate guise.

15.     At all times mentioned herein, Defendants and each of them completely controlled, dominated, managed, and operated the other Defendants and intermingled their assets with the assets owned by the other Defendants to suit their convenience, such that the individuality or separateness of the Defendants did not exist.

16.     The acts of Defendants and each of them were and are the acts of the other Defendants.

17.     Failure to pierce the corporate veil would promote injustice and, based thereon, Defendants and each of them are jointly and severally liable with the other Defendants.

**FACTS**

18.     This matter concerns a Pyramid,/Ponzi scheme that targeted members of the Asian-American and Hispanic-American communities as well as foreign investors, which the Securities and Exchange Commission shut down on March 27, 2014 in an action entitled *Securities and Exchange Commission v. World Capital Market Inc., WCM777 Inc., WCM777 Ltd. And Ming Xu*, 2:14-CV-02334.

19.     WCM777 is the umbrella name used for a multi-level marketing scheme that was at the heart of the SEC action.

20.     World Capital Market Inc., is a Delaware Corporation headquarted in Pasadena, California.  Ming Xu is the founder and chairman of World Capital Market Inc.  World Capital Market Inc., is also a corporation organized under the laws of the British Virgin Islands.

21.     At all relevant times, Ming Xu resided in California and World Capital Markets, Inc., WCM777 Inc., and WCM777 Ltd., had offices in or did business in the United States and specifically California.

22.     On March 27, 2014, the Court Ordered the seizure of assets of WCM777, the appointment of a receiver, and other provisional relief pursuant to an *Ex Parte* application by the

4

1   Securities and Exchange Commission.

2       23.    On July 30, 2014, the Court entered a Judgment against Ming Xu pursuant to a consent

3   by him.   As part of the Judgment Xu consented to disgorgement of ill-gotten gains, prejudgment

4   interest thereon, and a civil penalty.   Xu did not contest the following facts:

5       (a) World Capital Markets, Inc., described itself as a global merchant investment

6       bank with branch offices in the United States, China and Japan.   World Capital

7       Markets, Inc., purported to be in partnership with over 700 investment

8       organizations including, among others, Siemens, Denny's, and Goldman Sachs.

9       On the WCM777.com website, World Capital Markets, Inc., was shown to be a

10      corporation registered with the Registrar of Corporate Affairs of the British

11      Virgin Islands.

12      (b) WCM777 solicited investors through the website at WCM777.com, in-person

13      seminars and presentations, webinars, and through the Internet such as through

14      posts on Facebook and other message boards.   WCM777 solicited investors in

15      the United States and abroad.

16      (c) At all material times, the terms of the offering on the WCM777 website have

17      remained constant.   WCM777 prepared and distributed a PowerPoint

18      presentation that explains the WCM777 offering.   This presentation has been

19      translated into Chinese and Spanish.

20      (d) WCM777 offered and sold five different levels of packages of cloud-based

21      computing services.   In addition to the computing services, each package level

22      promised returns in the form of cash and points.

23      (e) WCM777 said investors could earn the cash and points by referring new

24      members, or by simply being passive.   The points were said to have two uses:

25      (a) they could be redeemed for goods and services to be offered by WCM777

26      and its affiliates, or (b) they could be also converted into equity in an initial

27      public offering of a company named WCM7.com, or other unidentified high

28      tech company that WCM777 claimed they would bring public.

**CLASS ACTION COMPLAINT**

(f) Each of the five different levels of membership units purported to provide purchasers with some combination of cloud computing services, with more services being provided to members who purchased higher levels. There were seven types of World Cloud Media Products: a) videos, b) books, c) music, d) games, e) space, f) social and g) Lucky Cloud. The five levels of membership units provided different combinations of World Cloud Media Products for different terms of from one to five years.

(g) Each of the five levels of packages promised to pay a return in 100 days which was called the Global Business Bonus. The first four levels of packages promised to pay a total return of approximately 100% of the amount invested, with half paid in cash and half paid in points. The fifth, or highest level offered to pay a total return of 160% of the amount invested, with half paid in cash and half paid in points. Thus, the fifth level offered to pay an 80% return in cash in 100 days.

(h) WCM777 did not realize any appreciable revenue other than from the sale of "packages" of cloud services to investors. WCM777 was not profitable and was a pyramid scheme. WCM777 used some of the investor funds to make Ponzi payments of returns to investors. The bulk of the investor funds were used to pay cash for real property purchased in the United States.

(i) WCM777 was a classic unlawful pyramid scheme. WCM777 sold its products exclusively to investors and had no apparent source of revenues other than money received from new investors. WCM777 did not offer to sell any of the so-called World Cloud Media Services other than as part of a package to investors who received points.

(j) The WCM777 offering and operation depended almost entirely on the recruitment of new investors and purchases by existing investors to provide funds to pay any returns to investors.

24. From March 2013 through September 2013, WCM777 deposited investor funds from

its offering into two bank accounts in the United States.  One account held in the name WCM777 received approximately $20 million of investor proceeds during this period.  The other account held in the name WCM777 Inc. received approximately $8 million of investor funds.  The investor funds deposited into WCM777's United State bank accounts originated from persons in the United States and abroad.

25.     Around October 2013, at the same time that state regulators began investigating WCM777's offering, it stopped depositing investor funds into the United States bank accounts, although the WCM777 offering in the United States continued.  Since October 2013, WCM777 raised more than $37 million from investors, which has been deposited into its Hong Kong bank accounts at Defendant HSBC Hong Kong.  Since October 2013 approximately 38% of investor funds raised came from persons residing in the United States.

26.     In September of 2013, the Securities Division of the Commonwealth of Massachusetts began investigating World Capital Markets, Inc., and WCM777, Inc.

27.     Also starting in September, 2013, WCM777 began directing all investors to wire transfer their investments to Defendant HSBC Hong Kong.  WCM777 explicitly stated on its website and Facebook page and other social networks that the reason it was shifting its operation to Hong Kong was because its continued operation in the United States was illegal.

(a) From at least September 29, 2014, the WCM777.com website changed the contact information for WCM777 from an address and phone number in the City of Industry in California to an address and phone number in Hong Kong.

(b) On or about October 4, 2013, the WCM777.com website announced that the WCM777 operation in the United States had closed.  It said its "global legitimacy strategy is to set up different system [sic] in each county to abide by local laws."

(c) Since at least January 23, 2014, the WCM777.com website announced that "Kingdom 777 acquired the asset of WCM777 on December 30[th], 2013 from World Capital Market (BVI).  WCM777 is renamed "Kindom777'.  Kingdom777 is founded by a group of visionaries with faith.  They share the

same vision of 'United by love and Build a City upon a Hill's the founders, Dr. Phil Ming Xu and Tiger Liu. After the acquisition, Dr. Phil Ming Xu and Tiger will not be officers but are given the honorary title of 'Founders'. Kingdom777 will transform WCM777 and stop the existing promotion and change the system to be legal globally. The payout ratio will be reasonable after the restricting period and also the company is planning to register its stock with SEC and launching 777 Points Trading, collateralized by the company's stock. It is like secondary market trading before the IPO."

28. On November 11, 2013, the Securities Division of the Commonwealth of Massachusetts issued a Consent Order in the Matter of World Capital Markets, Inc. & WCM777, Inc. The Consent Order stated that Massachusetts opened an investigation in September 2013, and in November 2013 the respondents submitted to an offer of settlement. The Order was made publicly available through the internet.

29. On or about November 20, 2013, the WCM777.com website announced the WCM777 Response to Massachusetts Consent Order. It said "because the sale of securities failed to fully comply with laws and regulations in the United States, our operations in the U.S. will be on hold until further notice; WCM Limited will continue operations."

30. WCM777 continued to be publically shut down by state after state.

(a) On January 8, 2014, the State of California, Business, Consumer Services and Housing Agency, Department of Business Oversight, issued a Desist and Refrain Order against WCM, WCM777, Inc., WCM777 Limited, Ming Xu, and others, which found that the named parties had unlawfully sold unregistered securities, and had made untrue statements of material fact and omissions of material facts necessary to make statements not misleading in the offer and sale of securities, and ordered them to desist from such conduct. The Order was made publicly available through the internet.

(b) On January 21, 2014, the Securities Commissioner for the State of Colorado issued a Stipulation for consent Cease and Desist Order Concerning World

8

Capital Markets, Inc., WCM777, Inc. and Ming Xu.  The Order was made publically available through the internet.

(c) On March 3, 2014, the State of Alaska, Department of Commerce, Community & Economic Development issued an Investor Fraud Alert concerning World Capital Market, Inc., WCM777, Inc. and WCM777 Limited.  The Alert was made publically available through the internet.

## HSBC

31.    The WCM777 scheme could not have continued to scam victims of millions of dollars after getting shut down in state after state if it were not for the accounts at Defendant HSBC Hong Kong.

32.    Defendant HSBC Hong Kong provided WCM777 this sanctuary despite the fact that its parent company HSBC Holdings plc, and its American counterpart, Defendant HSBC USA, had just finalized a Deferred Prosecution Agreement for knowingly providing money laundering services for Mexican drug cartels, in part, by setting up Anti-Money Laundering procedures that made them willfully blind to their customers and their actions.

33.    On or about December 11, 2012, Defendant HSBC USA, entered into a Deferred Prosecution Agreement relating to its willful failure to maintain an effective anti-money laundering program, among other things.  Also a party to the agreement was HSBC Holdings plc, a financial institution holding company organized under the laws of England and Wales.  Defendant HSBC Hong Kong is a subsidiary of HSBC plc.

34.    As part of the Deferred Prosecution Agreement HSBC USA acknowledged that one of its high risk products was its correspondent banking practices and services.  Correspondent accounts are established at banks to receive deposits from, make payments on behalf of, or handle other financial transaction for foreign financial institutions.  In essence correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have a direct relationship.  Such correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has no diligence information on, the foreign financial

**CLASS ACTION COMPLAINT**

1  institution's customers who initiated the wire transfers.

2  35.  Defendant HSBC USA, at all times relevant, maintained a correspondent account for

3  HSBC Hong Kong.

4  36.  As part of the Deferred Prosecution Agreement HSBC USA admitted its failure to

5  adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers

6  located in countries that it classified as "standard" or "medium" risk, including over $670 billion in

7  wire transfers from HSBC Mexico.

8  37.  As part of the Deferred Prosecution Agreement HSBC USA acknowledged that another

9  way for financial institutions to mitigate the risk associated with correspondent banking is monitoring

10  the wire transfers to and from these accounts.  From 2006 to 2009, wire HSBC USA monitored wire

11  transfers using an automated system called the Customer Account Monitoring Program ("CAMP").

12  The CAMP sustem would detect suspicious wire transfers based on parameters set by HSBC USA.

13  Under the Camp system, various factors triggered review, in particular, the amount of the transaction

14  and the type and location of the customer.  During this period HSBC USA assigned each customer a

15  risk category based primarily on the country in which it was located.  Countries were placed into one

16  of four categories based on the perceived anti money laundering risk of doing business in that country

17  (from lowest to highest risk): standard, medium, cautionary, and high.  Transactions that met the

18  thresholds for review and the parameters for suspicious activity were flagged for additional review by

19  HSBC USA' anti money laundering department.  These were referred to as alerts.

20  38.  As part of the Deferred Prosecution Agreement HSBC USA implemented a new

21  customer risk-rating methodology based on a multifaceted approach that weighs the following factors:

22  (1) the country where the customer is located, (2) the products and services utilized by the customer,

23  (3) the customer's legal entity structure, and (4) the customer and business type.

24  39.  As part of the Deferred Prosecution Agreement HSBC USA agreed that it had

25  implemented a new automated monitoring system.  The new system monitors every wire transaction

26  that moves through HSBC USA.  The system also tracks the originator, sender and beneficiary of a

27  wire transfer, allowing HSBC USA to look at its customer's customer.

28  40.  Plaintiffs are informed and believe and on such information and belief allege that

**CLASS ACTION COMPLAINT**

Defendant HSBC USA served as the intermediary bank for numerous wire transfers from investor-victims of WCM777 to accounts at HSBC Hong Kong.

41.     Plaintiffs are informed and believe and on such information and belief allege that the wire transfers for which Defendant HSBC USA served as the intermediary bank resulted in multiple alerts resulting in greater scrutiny of the transaction.

42.     Plaintiffs are informed and believe and on such information and belief allege that as part of the scrutiny performed by Defendant HSBC USA it conducted an internet search of WCM777.

43.     Plaintiffs are informed and believe and on such information and belief allege that Defendant HSBC USA knew that WCM777 was receiving millions of United States Dollars wire transferred into its accounts at HSBC Hong Kong.

44.     As part of the Deferred Prosecution Agreement HSBC Holdings plc agreed that it had "undertaken to implement a single global standard shaped by the highest or most effective anti-money laundering standards available in any location where the HSBC Group operates.  This new policy will require that all HSBC Group Affiliates will, at a minimum, adhere to U.S. anti-money laundering standards."

45.     As part of the Deferred Prosecution Agreement HSBC Holdings plc agreed: "To the extent HSBC Holdings plc's compliance with this Agreement requires it.  HSBC Holdings plc agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns comply with the requirements and obligations set forth in this Agreement, to the full extent permissible under locally applicable laws and regulations, and the instruction of local regulatory agencies."

46.     As part of the Deferred Prosecution Agreement HSBC admitted that "Congress enacted the Bank Secrecy Act, Title 31, United States Code, Section 5311 et seq. (the "BSA"), and its implementing regulations to address an increase in criminal money laundering activity through financial institutions.  Among other things, the BSA requires domestic banks, insured banks, and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, terrorist financing, and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax, or regulatory investigations or proceedings."

**CLASS ACTION COMPLAINT**

47.     Plaintiffs are informed and believe and on such information and belief allege that pursuant to the Deferred Prosecution Agreement of December 11, 2012, Defendant HSBC Hong Kong at all relevant times had in place a Know Your Customer ("KYC") procedure that, at a minimum, adhered to U.S. anti-money laundering standards.

48.     In or about July of 2013, Defendant HSBC Hong Kong opened an account ending in 7826 for WCM777 Ltd.  The account was a Business Vantage foreign currency account that allowed for deposit of United States Dollars.

49.     WCM777 Ltd., is a Hong Kong corporation that was registered in July of 2013. WCM777 Ltd, is a subsidiary of World Capital Markets, Inc., from the British Virgin Islands, with partial ownership in Ming Xu and Suo Zhong Xu.  On February 21, 2014, WCM777 Ltd., registered with the California Secretary of State, stating that it was doing business as WCM777 Enterprises, Inc., and was located in the City of Industry in California.

50.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that WCM777 Ltd., had just been incorporated in China.

51.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the parent company of WCM777 Ltd., was World Capital Markets, Inc., a corporation of the British Virgin Islands.

52.     The British Virgin Islands is, and, at all relevant times, was listed by the U.S. Department of State as a Jurisdiction of Primary Concern among known money laundering countries.

53.     Plaintiffs are informed and believe and on such information and belief allege that Defendant HSBC Hong Kong knew that the British Virgin Islands was listed by the U.S. Department of State as a Jurisdiction of Primary Concern among known money laundering countries.

54.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Ming Xu was a shareholder and director of WCM777 Ltd.

55.     Plaintiffs are informed and believe and on such information and belief allege that by

**CLASS ACTION COMPLAINT**

virtue of its anti-money laundering procedures Defendant HSBC Hong Kong required WCM777 Ltd., to agree that all data relating to it, its directors, shareholders, partners, members or other officers, employees, proposed guarantors or security providers and/or related individuals which are provided by it from time to time at HSBC Hong Kong's request or collected in the course of dealings between it and HSBC Hong Kong ("Data") may be used and retained by HSBC Hong Kong and disclosed to any agent, contractor or service provider of HSBC Hong Kong, any actual or proposed transferee of the requested facility, any member of the HSBC Group and such other third parties as HSBC Hong Kong considers reasonably necessary (in each case whether within or outside Hong Kong) (collectively, "permitted disclosures") for the purpose of complying with laws, regulations or judicial process."

56.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that WCM777 Ltd., offered investments.

57.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the source of funds for WCM777 Ltd., would largely consist of U.S. Dollars from the United States.

58.     Plaintiffs are informed and believe and on such information and belief allege that in or about August of 2013, Defendant HSBC Hong Kong opened an account for Agape Technology Ltd. The account was a Business Vantage foreign currency account that allowed for deposit of United States Dollars.

59.     Agape Technology Ltd., is a Hong Kong corporation that was registered in August of 2013.  Agape Technology Ltd, is a subsidiary of World Capital Markets, Inc., from the British Virgin Islands, with partial ownership in Ming Xu and Suo Zhong Xu.

60.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Agape Technology Ltd., had just been incorporated in China.

61.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the parent company of Agape Technology Ltd., was World Capital Markets, Inc., a corporation of the British

**CLASS ACTION COMPLAINT**

Virgin Islands.

62.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Ming Xu was a shareholder and director of Agape Technology Ltd.

63.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Agape Technology Ltd., was part of WCM777 and offered investments.

64.     Plaintiffs are informed and believe and on such information and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the source of funds for Agape Technology Ltd., would largely consist of U.S. Dollars from the United States.

65.     Hong Kong had in effect at all relevant times an Anti-Money Laundering and Counter-Terrorist Financing Ordinance ("AMLO"), which imposed Know Your Customer requirements on financial institutions such as Defendant HSBC Hong Kong.

66.     According to the Guideline on Anti-Money Laundering and Counter-Terrorist Financing of July 2012, published pursuant to section 7 of the AMLO, as part of the Customer Due Diligence required to be conducted, Financial Institutions, such as Defendant HSBC Hong Kong, were expected to understand the purpose and intended nature of a customer's business, in part by visiting the entity's internet website, keeping in mind that the veracity of the statements made on the website could not be relied upon entirely. (4.9.6)

67.     Plaintiffs are informed and believe and on such information and belief alleged that Defendant HSBC Hong Kong visited the WCM777.com website.

68.     Section 25(4) of the Organized and Serious Crimes Ordinance stipulates that an indictable offense includes conduct outside Hong Kong which would constitute an indictable offense if it had occurred in Hong Kong.  Therefore, where a Financial Institution in Hong Kong has information regarding money laundering, irrespective of the location, it should consider seeking clarification with and making a report to the JFIU.

69.     The Hong Kong Pyramid Schemes Prohibition Ordinance makes the promotion of a pyramid scheme an offense.

14

**CLASS ACTION COMPLAINT**

70.     Between July to December of 2013, the WCM777 Ltd., account at Defendant HSBC Hong Kong received over $37 million in United States dollars alone.

71.     Between October 12, to November 14, 2014, there were approximately 1,681 wire transfers of United States dollars into the WCM777 Ltd., account at Defendant HSBC Hong Kong.

72.     In all 8 WCM777 entities or related individuals, including WCM777 Ltd, and Agape Technology Ltd, had a total of 23 bank accounts at Defendant HSBC Hong Kong with funds held in United States Dollars, Hong Kong Dollars, Swiss Francs, British Pounds and Euros.

73.     Defendant HSBC Hong Kong allowed over $29,000,000 in transfers from the WCM777 Ltd., account to foreign and domestic accounts used by WCM777 entities.

74.     On March 31, 2014 the SEC issued a press release regarding the fact that it halted the WCM777 Pyramid scheme targeting Asian and Latino Communities.   The press release was specifically available on the SEC.gov website.

75.     On April 4, 2014, the Receiver sent Defendant HSBC Hong Kong a copy of March 27, 2014 Temporary Restraining Order, which, among other things, froze the accounts of WCM777 Ltd.

76.     On April 7, 2014, Defendant HSBC Hong Kong responded to the Receiver by stating it would not abide by the Temporary Restraining Order or take any action regarding the WCM777 account.

77.     Plaintiffs are informed and believe and on such information and belief allege that Defendant HSBC Hong Kong both prior and subsequent to April 4, 2014, allowed WCM777, to withdraw all money from its accounts.

78.     To date, Defendant HSBC Hong Kong has refused to cooperate with U.S. authorities, including the court appointed Receiver.

## CLASS ALLEGATIONS

79.     Plaintiffs, Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class who are similarly situated and who fall within the following class definition: All individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong.

**CLASS ACTION COMPLAINT**

For purposes of this class definition, an individual or entity lost money only if the amount of money that the individual or entity received from WCM777, including any return on investment, commissions, fees or any other payments, was less than the amount of the individual's or entity's money invested with WCM777. Excluded from the Class are governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, the Defendants, along with their respective parents, subsidiaries and/or affiliates. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity

80.    Plaintiff Ramiro Giron fits within the definition of a Class Member.  Mr. Giron was lured into investing in WCM777.  On November 22, 2013, Mr. Giron wire transferred $8,000, to the WCM777 Ltd account at HSBC Hong Kong.

81.    Plaintiff Nicolas J. Herrera fits within the definition of a Class Member.  Mr. Herrera was lured into investing in WCM777.  On November 12, 2013, Mr. Herrera wire transferred $2,000, to the  Agape Technology Ltd account at HSBC Hong Kong.

82.    Plaintiff Orlando Antonio Mendez fits within the definition of a Class Member.  Mr. Mendez was lured into investing in WCM777.  On October 15, 2013, Mr. Mendez wire transferred $10,000 to the WCM777 Ltd account at HSBC Hong Kong.  Plaintiffs are informed and believe and on such information and belief allege that Defendant HSBC USA served as the intermediary bank for this transaction.

83.    Plaintiffs do not know the exact size of the class.  However, Plaintiffs believe that the number is so numerous that joinder is impracticable.  Plaintiffs do note that the Receiver has determined that WCM777 processed approximately 9,000 payouts to investors.

84.    The claims of Representative Plaintiffs are typical of the claims of the class in that Plaintiffs sent money to HSBC Hong Kong to invest in and become a WCM777 member.  Indeed, Representative Plaintiffs' investments were in all relevant respects typical of investments by other class members, and the monetary damages and injunctive relief sought is common to the class.

85.    Representative Plaintiffs will fairly and adequately protect the interest of the class in that Representative Plaintiffs, have no conflicts with any other members of the class, and are

represented by experienced and able counsel.  The Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the class members.

86.     Numerous questions of law and fact are common to the class, including, but not limited to the following:

        (a) Whether a fiduciary relationship existed between WCM777 and Class Members;

        (b) Whether WCM777 breached a fiduciary duty to Class Members;

        (c) Whether Class Members' damages were caused by the breach of fiduciary duty owed to them by WCM777;

        (d) Whether Defendants aided and abetted the breach of a fiduciary duty to Class Members by WCM777;

        (e) Whether WCM777 intentionally misrepresented or conceal material facts to Class Members;

        (f) Whether WCM777 did so to induce reliance by Class Members;

        (g) Whether Class Members were justified in relying on the misrepresentations of material facts by WCM777;

        (h) Whether Class Members' damages were caused by misrepresentation or concealment of material facts;

        (i) Whether HSBC Hong Kong knew of the fraudulent activities of WCM777;

        (j) Whether HSBC Hong Kong substantially assisted the fraudulent activities of WCM777;

        (k) Whether HSBC USA knew of the fraudulent activities of WCM777;

        (l) Whther HSBC USA substantially assisted the fraudulent activites of WCM777;

        (m) Whether HSBC Hong Kong participated, directly and indirectly, in the conduct of the affairs of WCM777 through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), and, therefore, engages in unlawful business acts and practices under Bus. & Prof. Coe §§17200 *et seq.*;

        (n) Whether HSBC Hong Kong engages in action of Laundering of Monetary

**CLASS ACTION COMPLAINT**

Instruments (18 U.S.C. §1956), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957), wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841), and therefore, engaged in unlawful business acts and practices under Bus. & Prof. Coe §§17200 *et seq.*;

(o) Whether HSBC Hong Kong committed tortious acts with fraud, oppression or malice;

(p) Whether HSBC Hong Kong, HSBC USA and WCM777 collectively constituted an "enterprise" with the meaning of that term as used in 18 U.S.C. §1962(c);

(q) Whether the aforesaid enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce;

(r) Whether HSBC Hong Kong and HSBC USA participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a patter of racketeering activity in violation of 18 U.S.C. §1962(c);

(s) Whether HSBC Hong Kong's continuous and repeated violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

87.   The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of California law.  Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual

litigation.

## COUNT I

### Aiding and Abetting Fraud

88.     Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

89.     WCM777 intentionally defrauded every investor, including Plaintiff herein.  WCM777 falsely represented that it was a profitable enterprise, when in fact it was a pyramid scheme with no source of revenue other than sales to investors, and it was not deriving a profit from the sale of goods and services to third parties.   WCM777 failed to disclose material information that it was not profitable and did not have any source of revenue other than sales to investors.

90.     Plaintiffs would not have invested in WCM777 had they known the truth.

91.     Defendant HSBC Hong Kong knew that WCM777 was engaging in fraud. Nonetheless, Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order.

92.     Defendant HSBC USA knew that WCM777 was engaging in fraud.  Nonetheless, Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

93.     As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

94.     The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

## COUNT II

### Aiding and Abetting Breach of Fiduciary Duty

95.     Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

96.     WCM777 was an investment advisor to all of the Plaintiffs.  As a result, WCM777 owed Plaintiffs, who were their member/clients, fiduciary duties.  WCM777 breached the fiduciary duties they owed to the Plaintiffs.

97.     Defendant HSBC Hong Kong, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

98.     Defendant HSBC USA, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

99.     Defendant HSBC Hong Kong, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

100.    Defendant HSBC USA, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

101.    Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order.

102.    Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

103.    As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

104.    The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

## COUNT III

### Aiding and Abetting an Endless Chain Scheme, C.C.P. §1689.2

105.    Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

106.    WCM777 operated an Endless Chain Scheme as defined by Cal. Penal Code §327.

107.    Defendant HSBC Hong Kong, at all material times, had actual knowledge that

**CLASS ACTION COMPLAINT**

1  WCM777 operated an Endless Chain Scheme.

2       108.   Defendant HSBC USA, at all material times, had actual knowledge that WCM777

3  operated an Endless Chain Scheme.

4       109.   Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by

5  providing accounts into which investors' money could be wire transferred to, comingling of funds

6  between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the

7  District Court's order.

8       110.   Defendant HSBC USA substantially assisted and aided and abetted WCM777 by

9  serving at the intermediary bank by which investors' money could be wire transferred to WCM777

10  accounts in Hong Kong.

11       111.   As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage

12  in an amount not currently known, but believed to exceed $37,000,000.

13       112.   The Defendants' actions were malicious, fraudulent, oppressive and intended to injure

14  Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

15                              **COUNT IV**

16                  **Violation of 18 U.S.C. §1961 et seq. (RICO)**

17       113.   Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set

18  forth by this reference.

19       114.   Defendant HSBC Hong Kong is a "person" within the meaning of that term as used in

20  18 U.S.C. §1962(c).

21       115.   Defendant HSBC USA is a "person" within the meaning of that term as used in 18

22  U.S.C. §1962(c).

23       116.   At all times relevant to this complaint Defendant HSBC Hong Kong, Defendant

24  HSBC USA and WCM777 collectively constituted an "enterprise" within the meaning of that term as

25  used in 18 U.S.C. §1962(c). Plaintiffs are informed and believe that the Enterprise is an ongoing

26  association that functions as a continuing unit for the purposes of these acts of racketeering alleged

27  above as well as for other purposes.

28       117.   At all times relevant to this complaint, each of the Defendants was associated with the

**CLASS ACTION COMPLAINT**

1   aforesaid enterprise.

2       118.   Upon information and belief, and as previously described herein, each of the

3   Defendants participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise

4   through a patter of racketeering activity, in violation of 18 U.S.C. §1962(c).

5       119.   Upon information and belief, and as previously described herein, Defendants'

6   racketeering activity consists of numerous related and continuous acts in violation of 18 U.S.C. §1956

7   (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in

8   Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C.

9   §1841 (mail fraud).

10      120.   As previously described herein, upon information and belief, Defendants attempted to

11  commit and committed acts of Laundering of Monetary Instruments (18 U.S.C. §1956), Engaging in

12  Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957),

13  wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841).  These acts include, but are not

14  limited to:

15          (a) Defendant HSBC Hong Kong received thousands of wired money transfers

16              from investors who were duped.

17          (b) Defendant HSBC USA acted as the intermediary bank for thousands of wired

18              money transfers from investors who were duped.

19          (c) On numerous occasions, Defendant HSBC Hong Kong transferred the

20              comingled funds to accounts for other WCM777 entities

21          (d) On a number of occasions, Defendant HSBC Hong Kong wired the comingled

22              funds back to the United States for escrow and other accounts in the name of

23              other WCM777 entities.

24      121.   Upon information and belief, Defendants attempted to, conspired to and did affect

25  commerce by said acts in violation of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18

26  U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful

27  Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud).

28      122.   Upon information and belief, Defendants' continuous and repeated violations of 18

**CLASS ACTION COMPLAINT**

U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a patter of racketeering activity with the meaning of 18 U.S.C. §1962(c).

123.   Upon information and belief, Defendants violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) injured Plaintiffs in that these acts aided, abetted and perpetuated the Pyramid scheme.

124.   By reason of the foregoing, the Plaintiffs have been, and will continue to be, injured in their business and property in an amount not currently known, but believed to exceed $37,000,000.

## COUNT V

### Violation of California Business and Professions Code §§17200 *et seq.*

125.   Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

126.   As described above, Defendant HSBC Hong Kong and Defendant HSBC USA participated in and perpetuated a Pyramid scheme by engaging in acts that include, but are not limited to:

(a) Defendant HSBC Hong Kong accepted millions of United States dollars in investors' funds, commingled these funds into several accounts under differing WCM777 related entities;

(b) Defendant HSBC Hong Kong wired United States money back to the United States;

(c) Defendant HSBC Hong Kong refused to abide by the Temporary Restraining Order issued by the U.S. District Court freezing all WCM777 accounts and appointing a Receiver;

(d) Defendant HSBC USA acted as the intermediary bank for investor funds in millions of United States dollars that were wire transferred to WCM777 related entity accounts in Hong Kong.

**CLASS ACTION COMPLAINT**

127. Defendant HSBC Hong Kong aided and abetted the perpetuation of a Pyramid/Ponzi scheme intended to mislead investors, which is a *per se* fraudulent business practice.

128. Defendant HSBC USA aided and abetted the perpetuation of a Pyramid/Ponzi scheme intended to mislead investors, which is a *per se* fraudulent business practice.

129. Accordingly, Plaintiffs may obtain all remedies and penalties authorized by the statue, including, without limitation, restitution, disgorgement, and other penalties for each illegal or fraudulent business act or practice, and attorneys' fees pursuant to statute and the court's equitable powers, in an amount subject to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez, on behalf of themselves and members of the class, pray for judgment against Defendants, jointly and severally, as follows:

1. Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez as the representatives of the class;

2. For aiding and abetting breach of fiduciary duty, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure §3294;

3. For aiding and abetting fraud, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure §3294;

4. For violation of aiding and abetting an Endless Chain Scheme, C.C.P. §1689.2 all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, attorneys fees pursuant to statute and the Court's equitable powers, and punitive damages pursuant to California Code of Civil Procedure §3294;

**CLASS ACTION COMPLAINT**

5.   For violation of 18 U.S.C. §1962 *et seq.* (RICO), all Plaintiffs, including the Class Representatives on behalf of Class members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, trebling of those damages, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure §3294;

6.   For reasonable attorneys' fees and costs of suit as permitted by law;

7.   For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully Submitted,

WARD & HAGEN LLP

Dated: November _13_, 2015

By:   Steven M. Nunez, Esq.
*Attorney for Plaintiff*

JULIO J. RAMOS, Esq. SBN. 189944
LAW OFFICES OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, California 94102
Telephone:      (415) 948-3015
Facsimile:      (415) 469-9787

**CLASS ACTION COMPLAINT**