Peter C. Ward, Esq.            SBN 126459
Christopher H. Hagen, Esq.     SBN 179529
Steven M. Nuñez, Esq.          SBN 185421
**WARD & HAGEN, LLP**
440 Stevens Avenue, Suite 350
Solana Beach, California 92075
Telephone:   (858) 847-0505
Facsimile:   (858) 847-0105

Julio J. Ramos, Esq.           SBN. 189944
**LAW OFFICES OF JULIO J. RAMOS**
35 Grove Street, Suite 107
San Francisco, California 94102
Telephone:   (415) 948-3015
Facsimile:   (415) 469-9787

*Attorneys for Plaintiffs Ramiro Giron Nicolas J. Herrera*
*and Orlando Antonio Mendez.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMIRO GIRON, NICOLAS J. HERRERA, ORLANDO ANTONIO MENDEZ, on behalf of themselves and a class of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>HONGKONG AND SHANGHAI BANKING CORPORATION, LIMITED, a foreign company; HSBC BANK USA, N.A., a national banking association; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO.: 2:15-cv-08869-ODW-JCx<br><br>**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:        November 9, 2017**<br>**Time:        2:30 p.m.**<br>**Courtroom:  5D**<br><br>**Hon. Otis D. Wright II**<br><br>Trial Date: December 11, 2018<br>Discovery Cut Off: September 10, 2018<br><u>Oral Argument Requested</u> |

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. FACTS ..................................................................................................................... 2

    A.    WCM777 Was Conducting A Ponzi Scheme Based On Cloud Computing Services. ............................................................................................................... 2

    B.    When HSBC Opened The WCM777 Accounts, It Had Recently Entered Into A Deferred Prosecution Agreement Regarding Its Money Laundering Assistance To International Drug Cartels And Terrorist Organizations Through Wire Transfers. ..... 3

    C.    HSBC USA Discovered That WCM777 Was A Ponzi Scheme, But Continued To Help Transfer Millions Of Dollars To Hong Kong Accounts. ................................ 4

III. HSBC'S OWN DOCUMENTS EVIDENCE ITS ACTUAL KNOWLEDGE THAT WCM777 WAS CONDUCTING A PONZI SCHEME. .................................................. 6

IV. AFTER LEARNING WCM777 WAS A PONZI SCHEME NOT ONLY DID HSBC USA CONDUCT THE MAJORITY OF WCM777's WIRE TRANSFERS IT ALSO REFUSED TO PROVIDE ANY INFORMATION ABOUT WCM777 IN RESPONSE TO A SUBPEONA. ............................................................................... 7

V. HSBC's AIDING AND ABETTING OF THE WCM777 PONZI SCHEME HAS NOTHING TO DO WITH THE TECHNICALITIES OF A FUNDS TRANSFER ...... 10

VI. WCM777 COULD NOT ESCAPE A FIDUCIARY DUTY CLAIM, AND NEITHER CAN HSBC USA ....................................................................................... 11

    A.    Xu and WCM777 cultivated a relationship of Financial Consultant and Client. ... .............................................................................................................................. 11

    B.    That WCM777 Was a Ponzi Scheme Establishes Both a Fiduciary Duty and Breach Thereof Under the Trust Fund Doctrine. .................................................... 12

i

VII. THE PONZI SCHEME'S MESSAGE IN ITS INTERNET-BASED MARKETING
GOT THROUGH TO EACH PLAINTIFF ........................................................ 13

VIII. UCL REMEDIES ARE AVAILABLE ................................................... 15

IX. CONCLUSION ............................................................................ 16

**TABLE OF CONTENTS/TABLE OF AUTHORITIES**

1

## Cases

2  *Alexander v. Compton (In re Bonham),* 229 F.3d 750, 759 n. 1 (9th Cir.2000). .............9

3  *American Trust Co. v. California Western States Life Ins. Co.,* 15 Cal.2d 42, 68.........12

4  *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.app.4th 226 12

5  *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020 ...........................13

6  *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal. App. 4th 1138, 1145, (2005) .........................11

7  *Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517...............................................................12

8  *Equity Funding Corp. of America Securities Litigation,* 416 F.Supp.161 (C.D.Cal.,

9      1976).............................................................................................................................8

10  *First All. Mortg. Co.,* 471 F.3d 977, 995 (9th Cir. 2006). ..........................................2,7

11  *Massel v. Lettunich* (1967) 248 Cal.App.2d 68, 73 .......................................................14

12  *McGill v. Citibank, N.A.,* 2 Cal. 5th 945, 962 (2017) ....................................................16

13  *OCM Principal Opportunities Fund v. CIBC World Markets Corp.,* (2007) 157

14      Cal.App.4th 835.........................................................................................................14

15  *Perlman v. Wells Fargo Bank, N.A.,* (2014, 11th Cir) 559 Fed.Appx. 988......................6

16  *S.E.C. v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125...........................................11

17  *Saracco Tank & Welding Co. v. Platz* (1944) 65 Cal.App.2d 306 ................................12

18  *Seeger v. Odell* (1941) 18 Cal.2d 409, 415 ...................................................................15

19  *Vai v. Bank of America* (1961) 56 Cal.2d 329 ...............................................................12

20  *Vasquez v. Superior Court, supra.,* at p. 811-12...........................................................13

21  *Whiteley v. Phillip Morris, Inc.* (2004) 117 Cal.App.4th 635, 684 ................................15

22  *Zengen, Inc. v. Comerica Bank,* 41 Cal. 4th 239, 254, 158 P.3d 800, 808 (2007).........10

23

24

25

26

27

28

**TABLE OF CONTENTS/TABLE OF AUTHORITIES**

## Rules

FRCP § 56(d) ...................................................................................................17

Rule 23(b)(3)....................................................................................................11

Rule 23(b)(3)....................................................................................................16

## Other Authorities

California Uniform Commercial Code § 11101, et seq..................................10

Section 1103 ....................................................................................................10

# I. INTRODUCTION

Plaintiffs are victims of the WCM777 Ponzi scheme. HSBC USA defends having processed over $15 million of wire transfers of Ponzi scheme victim's money to HSBC Hong Kong after its own internet research showed that WCM777 was a Ponzi scheme by stating simply: "HSBC USA had actual knowledge of accusations on the internet, not of actual wrongdoing."[1] However, on an investigation entry dated October 2, 2013, an HSBC USA employee clearly reached the conclusion that WCM777 was a Ponzi scheme through a separate review of the WCM777 website:

> **Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed "daily" profit/returns by buying multi-level shares**" [2](emphasis added)

While insisting that it did not know WCM777 was a Ponzi scheme HSBC USA asserts that it blocked all wire transfers to WCM777 accounts at HSBC Hong Kong beginning on December 2, 2103. However, in deposition, the Senior Vice President of the Anti-Money Laundering Policy Office at HSBC North America Holdings admitted that his only basis for believing the wire transfers were blocked was from talking to HSBC USA counsel: "Q. And how did you come across the understanding that this committee had placed a block on the WCM777 ability to transfer funds to HSBC Hong Kong. A. It was based on my understanding, information and research conducted by our – by attorneys. Q. Okay. This is not information that you have obtained from any employees at HSBC? A. No. Q. Okay. And did the attorneys show you any documents to come to this understanding? A. No. We just – I reviewed the -- I had seen the account activity. This did."[3]

Although HSBC USA's internal documents acknowledged serving as the correspondent account for over $15 million worth of wire transfers to just one of

---

[1] (MSJ p20: 25 to 21:1-2)
[2] HBUS000615
[3] Declaration of Steven M. Nuñez, Ex. D, Deposition of Paul Khareyn, p. 213:6-23

**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**

WCM777's bank accounts with HSBC Hong Kong after October 2, 2013, it nonetheless claims that its actions are not causally related to the fraud perpetrated on victims whose money did not go through its bank. [4]  While it may have substantially assisted the Ponzi scheme by knowingly transferring $15 million of other people's money, it argues it did not assist in any fraud against victims whose money did not travel through HSBC Hong Kong's correspondent account at HSBC USA.   However, in a situation where a company's whole business is built like a house of cards on a fraudulent enterprise, this [distinction between assisting the business and assisting in the actual fraud] is a distinction without a difference." *In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006).

## II. FACTS

### A.   WCM777 WAS CONDUCTING A PONZI SCHEME BASED ON CLOUD COMPUTING SERVICES.

Through a savvy use of Christian imagery and high-tech buzzwords, WCM777 conveyed on its website, in power point presentations, and in social media pages (Facebook, YouTube, Twitter) the image of a successful, multi-billion dollar company. (Plaintiffs' Additional Material Facts "PAMF" 1) For as little as $399 - $2,000 U.S.D., investors could purchase units in this global company's profit sharing plan. (PAMF 1-2) WCM777 was described as an investment opportunity offering remarkable returns based on cloud computer services that were also available for use by the investor. (PAMF 1-2) WCM777 directly and indirectly, solicited investors through the website at WCM777.com, in person seminars and presentations, webinars, and through the Internet such as through posts on message boards.   (PAMF 3) The terms of WCM777's solicitations remained constant.   (PAMF 4) In fact, WCM777 generated no revenue apart from the investments made by victims. (PAMF 5) It was a Ponzi scheme, in every sense of the word. As state after state began investigating and shutting down WCM777, it

---

[4] HBUS000620

**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**

turned to HSBC to help place its continued operations outside the reach of United States jurisdiction. (PAMF 7). It opened up accounts at HSBC Hong Kong to hold U.S. Dollar balances and instructed new victims to send their funds directly to these accounts in Hong Kong. (PAMF 7 & 21) HSBC Hong Kong had only one correspondent account with a U.S. bank; it was at HSBC USA. (PAMF 22) And HSBC Hong Kong told customers that wire transfers of U.S. Dollars were to go through HSBC USA. (PAMF 23)

**B.      WHEN HSBC OPENED THE WCM777 ACCOUNTS, IT HAD RECENTLY ENTERED INTO A DEFERRED PROSECUTION AGREEMENT REGARDING ITS MONEY LAUNDERING ASSISTANCE TO INTERNATIONAL DRUG CARTELS AND TERRORIST ORGANIZATIONS THROUGH WIRE TRANSFERS.**

On December 11, 2012, Defendant HSBC USA entered into a Deferred Prosecution Agreement relating to its willful failure to maintain an effective anti-money laundering program. By willfully failing to monitor wire transfers, among other things, HSBC USA and its international affiliates had aided Mexican drug cartels and Middle Eastern terrorist organizations in laundering money for their illegal schemes, going back to 2002. Despite the fact that Defendant HSBC USA had entered into prior cease and desist orders with several other government agencies concerning its conduct, and had breached every one of those agreements, Defendant HSBC USA was allowed to enter into a Deferred Prosecution Agreement based on the anti-money laundering procedural and institutional changes it professed to have already taken, and others it had promised to make. (PAMF 8 & 9)

The Deferred Prosecution Agreement depended on the complete overhaul of correspondent account and wire transfer procedures HSBC USA asserted it had already implemented. As HSBC USA acknowledged, correspondent banking practices and services are extremely high risk. In essence correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have

a direct relationship.  They are considered high risk because the U.S. bank does not have a direct relationship with and therefore has no diligence information on the foreign financial institution's customers who initiate the wire transfers.[5]  As part of the Deferred Prosecution Agreement HSBC USA vouched that it had already implemented a new automated monitoring system.  The new system monitors every wire transaction that moves through HSBC USA.  The system also tracks the originator, sender, and beneficiary of a wire transfer, allowing HSBC USA to look at its customer's customer.[6]  HSBC USA also implemented a new customer risk-rating methodology based on a multifaceted approach that weighs: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type.  Transactions that meet a threshold for suspicious activity were flagged for additional review by HSBC USA's anti-money laundering department.[7]  Material or systemic AML control weaknesses at any affiliate that are reported by the Regional and Global Business Compliance heads are now shared with all other Regional and Global Business Compliance head facilitating horizontal information sharing. (PAMF 8 & 9)

## C.   HSBC USA DISCOVERED THAT WCM777 WAS A PONZI SCHEME, BUT CONTINUED TO HELP TRANSFER MILLIONS OF DOLLARS TO HONG KONG ACCOUNTS.

HSBC Hong Kong opened up its first bank account for WCM777 in July of 2013, just seven months after its parent company entered into the Deferred Prosecution Agreement with the U.S. Government. Beginning in September of 2013, WCM777 diverted all of its "business" to the HSBC Hong Kong bank accounts.  (PAMF 7) On or before September 30, 2013, the U.S. ANTI MONEY LAUNDERING (AML) Compliance Department at HSBC USA discovered that WCM777 was a Ponzi scheme.

---

[5] DPA, ¶ 13.
[6] DPA, ¶ 81(i)
[7] DPA, ¶ 81(g)

In response to wire transfers for which HSBC USA was to serve as the correspondent account for transfers to HSBC Hong Kong, the US AML Compliance Department conducted internet research on its customer's customer. (PAMF 10) The US AML Compliance Department discovered a Product Review of WCM777 that, in no uncertain terms, called it a Ponzi scheme:

> "Product wise I have no idea why WCM777 list [sic] WCM7's could-based services on their website.   The cloud services have nothing to do with WCM777's compensation plan or commission structure. [¶] The idea that affiliates are somehow purchasing access to WCM7 cloud-based services fall flat when you consider that affiliates can purchase multiple positions in the compensation plan.   Re-investment via repurchase of positions only makes any such claims even more absurd. [¶] **Compensation plan wise WCM777 pretty much resembles that of your typical Ponzi scheme.  Affiliates put in money and the more money they put in the more money they get out.** [graphic not depicted] Affiliates join the company and then pick an investment level they wish to invest in at. Upon doing this WCM777 pay[sic] them a passive 100-day ROI, with additional commissions paid out if they recruit others who make investments with the company.[8] (emphasis added).

The HSBC USA, US AML Compliance Department did its own investigation and also came to the conclusion that WCM777 was a Ponzi scheme:

> "BENE – WCM777 LIMITED though identified by its website and no adverse information on RDC, internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (sample google results attached) … **Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed "daily" profit/returns by buying multi-level shares**"[9] (emphasis added).

Neither HSBC USA nor HSBC Hong Kong stopped doing business with WCM777 despite knowing it was a Ponzi scheme.

On September 26, 2013, the California Department of Business Oversight

---

[8] HBUS000648-HBUS000650
[9] HBUS000615

5

**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**

subpoenaed from HSBC USA any and all records concerning WCM777's HSBC account number 817677826838, the same account that was being internally investigated. (PAMF 11) On October 2, 2013, HSBC USA responded to the subpoena saying it had no responsive documents, even though it had until October 31st to search. (PAMF 12) HSBC USA internal documents recognize over $15 million went through its correspondent account for HSBC Hong Kong in the single 817677826838 account. Finally, on March 27, 2014, the SEC shut down WCM777 in Federal District Court. (PAMF 14) The scheme utilized at least 6 other HSBC Hong Kong accounts to perpetuate the fraud.

### III. HSBC'S OWN DOCUMENTS EVIDENCE ITS ACTUAL KNOWLEDGE THAT WCM777 WAS CONDUCTING A PONZI SCHEME.

Tellingly, HSBC USA does not make its argument regarding its knowledge that WCM777 was running a Ponzi scheme as its primary argument in this Motion for Summary Judgment. Its argument against evidence of knowledge seems to acknowledge that it discovered an internet review of WCM777 that labels the investment a Ponzi scheme. HSBC USA, however, argues that it merely "had actual knowledge of accusations on the internet, not of actual wrongdoing." (MSJ p20: 25 to 21:1-2)

Proof of HSBC's knowledge that WCM777 was conducting a Ponzi scheme exists in the form of HSBC USA's Norkom Case Details Sheet dated 10/2/13. HSBC employee, Roehl Bugash, does not merely reference the fact that a reviewer had written a 20-page analysis ultimately concluding that WCM777 was a Ponzi scheme. The HSBC USA employee also notes that he agreed that WCM777 was a Ponzi scheme after independently reviewing the WCM777 website: "Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/Ponzi scheme as they offer no concrete underlying products/services while offering guaranteed 'daily' profit/returns by buying multi-level shares." If that statement by the HSBC USA employee does not evidence actual knowledge that WCM777 was running a Ponzi scheme, then what would? *Perlman v. Wells Fargo Bank, N.A.,* (2014, 11th Cir) 559 Fed.Appx. 988 (Actual knowledge shown when internal investigators recognized the

1  scheme, but did not close the account for 3 months.)

2  **IV. AFTER LEARNING WCM777 WAS A PONZI SCHEME NOT ONLY DID HSBC**

3  **USA CONDUCT THE MAJORITY OF WCM777's WIRE TRANSFERS IT ALSO**

4  **REFUSED TO PROVIDE ANY INFORMATION ABOUT WCM777 IN RESPONSE**

5  **TO A SUBPEONA.**

6  As this Court pointed out in denying HSBC's Motion to Dismiss, Plaintiffs have

7  always alleged that the Ponzi scheme was prolonged because HSBC Hong Kong

8  provided overseas accounts into which investor/victims were told to wire transfer their

9  investments. And, "as its correspondent bank, HSBC USA processed many of these wire

10  transfers." (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss,

11  p. 3:17-23) While HSBC USA has not provided admissible evidence that it did not

12  process the wire transfers for the three named plaintiffs, the fact that some class

13  member's money will not have been processed by HSBC USA does not negate the

14  "substantial assistance" or "causation" elements of aiding and abetting. In fact, the very

15  case on which HSBC USA relies, provides the support for the proposition that HSBC

16  USA need not have been involved in every fraudulent transaction in order to have

17  provided substantial assistance to the Ponzi scheme and for that assistance to have

18  proximately caused every subsequent Ponzi scheme victim's injury.

19  The Ninth Circuit in *In re First Alliance Mortgage Co.*, was faced with a similar

20  argument regarding Lehman Brothers' assistance to the First Alliance Mortgage Co.,

21  fraud. First Alliance's business model was to originate mortgages to consumer borrowers

22  and then pledge them to a secondary lender such as an investment bank or other financial

23  institution in return for a loan under a revolving line of credit. *In re First All. Mortg.*

24  *Co.*, 471 F.3d 977, 986 (9th Cir. 2006). Lehman Brothers started as one of several

25  investment banks later becoming the sole investment bank to do business with First

26  Alliance.[10] The jury returned a verdict on behalf of all mortgage fraud victims during the

27

28  [10] "During 1996 and 1997, Lehman co-managed four asset-backed securitization transactions for First Alliance. The mounting scrutiny and litigation against First Alliance caused alarm among some of its

relationship between Lehman and First Alliance, not just those people victimized when Lehman was the sole investment bank to First Alliance, as Defendant implies.  The ninth circuit specifically rejected Lehman Brother's argument that causation required it to have assisted each fraudulent mortgage transaction and not merely to have assisted the mortgage fraud business as a whole:

> "Lehman admits that it knowingly provided "significant assistance" to First Alliance's *business,* but distinguishes that from providing substantial assistance to *fraud.* In a situation where a company's whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference. The jury was not precluded as a matter of law from finding that Lehman substantially assisted First Alliance in its fraud." *Id.,* at p. 995.

Thus, providing the funds necessary for the First Alliance "business" was sufficient to prove substantial assistance and causation; no direct relationship to each fraudulent transaction was required.

The court in *In re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp.161 (C.D.Cal., 1976), similarly held that causation for aiding and abetting did not require transactional privity.  The case concerned a massive fraud at Equity Funding Corp., which continued eight years "with the aid, complicity, and neglect of many persons or business entities outside the EFCA structure." *Id.,* at p. 171.  One such group alleged to have aided and abetted the securities fraud was a group of defendants that sold EFCA securities between March 6, 1973 and March 27, 1973.  The court explained that "[i]n addition to harm done by the principals, assistance or participation by the aider and abettor, and knowledge or breach of duty by the aider and abettor, the plaintiffs must also show some causal connection between the conduct of the aider and abettor and the harm done plaintiffs by the principals before liability can attach to the conduct of the aider and

---

other lenders. By the end of 1998, First Alliance's other main lenders had withdrawn all funding, due in part to the potential liability facing First Alliance." *Id.*, at p. 986.  The district court certified a class consisting of all persons who had obtained First Alliance mortgage loans from May 1, **1996**, through March 31, 2000, …" *Id.*, at p. 987.

**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**

abettor." *Id.*, p. 180 (C.D. Cal. 1976).   The court explained that although causation required limiting the selling defendants' liability for aiding and abetting the EFCA insiders' fraud to people who purchased securities after March 6, 1973, it did not require limiting liability to only those people to whom the selling defendants sold their securities. As the court reasoned, the selling defendant's assistance to the fraud helped perpetuate the massive fraud on the entire market of victims, not just those to whom the selling defendants sold. Therefore, the court stated, "the privity arguments made by the defendants must be rejected. *Id.,* at p. 185.

In this case, HSBC USA provided substantial funds necessary for the perpetuation of the WCM777 Ponzi scheme. "[A] Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *Alexander v. Compton (In re Bonham),* 229 F.3d 750, 759 n. 1 (9th Cir.2000).   Thus, by definition it requires the constant influx of new investment money in order to sustain the fraud that it is a successful and prosperous business. HSBC USA internal documents recognize over $15 million went through its correspondent account for HSBC Hong Kong in the single 817677826838 account. Certainly, those $15 million are sufficient to allow a jury to conclude that HSBC USA's transfers sustained the continued operation of the WCM777 Ponzi scheme. Indeed, the very reason that WCM777 started having victims wire transfer money to HSBC Hong Kong was because it feared for its continued existence.   This substantial assistance to the fraudulent business that was WCM777 is sufficient to establish a causal link to those victims ensnared after HSBC USA gained knowledge of the Ponzi scheme, yet continued to process wire transfers.

HSBC USA not only helped provide at least $15 million vital to keep WCM777 afloat, but it also helped prevent authorities from more quickly discovering and stopping the Ponzi scheme. On September 26, 2013, HSBC USA was served a subpoena by the California Department of Business Oversight requesting any and all records concerning WCM777's HSBC account number 817677826838. On July 24, 2013, HSBC USA had

1   flagged a transaction involving a wire transfer to WCM777's HSBC Hong Kong account

2   with the same exact account number as that listed in the subpoena.  By September 30,

3   2013, HSBC USA investigators had discovered the internet allegations that WCM777

4   was a Ponzi scheme and had noted the unusual nature of its investment as detailed on its

5   own website.  By October 2, 2013, that same investigator concluded that WCM777 was,

6   in fact, a Ponzi scheme.  Nonetheless, On October 2, 2013, HSBC responded to the

7   subpoena by stating that it was unable to locate any information about the account listed

8   in the subpoena.  The subpoena did not even call for a response until October 31, 2013.

9   HSBC USA's immediate and misleading response clearly inhibited the authorities from

10  preventing all banks from allowing wire transfers to WCM777's accounts in HSBC Hong

11  Kong.  This is additional evidence from which a jury could conclude causation as to

12  every subsequent wire transfer.

13  **V.    HSBC's AIDING AND ABETTING OF THE WCM777 PONZI SCHEME HAS**

14  **NOTHING TO DO WITH THE TECHNICALITIES OF A FUNDS TRANSFER.**

15       HSBC USA argues that Plaintiffs' claims are displaced by the exclusivity of

16  California Uniform Commercial Code § 11101, et seq.  However, this exclusivity "is not

17  to say that the Uniform Commercial Code necessarily displaces all common law actions

18  based on all activities surrounding funds transfers.  *Zengen, Inc. v. Comerica Bank*, 41

19  Cal. 4th 239, 254, 158 P.3d 800, 808 (2007).  "Section 1103, which applies to the entire

20  California Code, provides: `*Unless displaced by the particular provisions of this*

21  *code,* the principles of law and equity, including the law merchant and the law relative to

22  capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress,

23  coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement

24  its provisions.'"  *Id.*, at p. 251.  HSBC USA points to nothing in the code that exempts

25  banks from liability when they are themselves complicit in fraud.  HSBC USA cites to

26  the UCC Official comment for the proposition that the UCC was enacted to allow banks

27  "to be able to predict risk with certainty, to insure against risk, to adjust operational and

28  security procedures, and to price funds transfer services appropriately."  However, the

1  only risk involved in aiding and abetting a fraud that uses wire transfers as a mechanism
2  is the risk of getting caught.  HSBC USA argues that its liability in this case is displaced
3  by the UCC by mischaracterizing that liability as being based on "accepting duly
4  authorized wire transfers."  Not true, while the ordinary transaction of wire transfers can
5  play a part in liability under the theory of aiding and abetting, the most critical element
6  is knowledge by the bank that a fraud is being committed.  Section 11212 of the Uniform
7  Commercial Code, upon which HSBC USA presumably relies, states simply that "the
8  bank owes no duty to any party to the funds transfer except as provided in this division
9  or by express agreement."  However, Plaintiffs are not making a claim for negligence or
10 seeking to impose any duty on the Bank in addition to those outlined in the Uniform
11 Commercial Code. Simply put, Plaintiffs claims against the bank are not for accepting
12 duly authorized wire transfers, but for processing those transfers knowing that it was
13 facilitating a Ponzi scheme. "Knowledge is the crucial element." *See, Casey v. U.S. Bank*
14 *Nat'l Ass'n,* 127 Cal. App. 4th 1138, 1145, (2005).    In so doing, HSBC USA was
15 complicit in the fraud, and no provision of the UCC displaces a fraud action directly
16 against a bank.

## VI.    WCM777 COULD NOT ESCAPE A FIDUCIARY DUTY CLAIM, AND NEITHER CAN HSBC USA.

### A.    Xu and WCM777 cultivated a relationship of Financial Consultant and Client.

21 The details of the Ponzi scheme clearly demonstrate an investment relationship
22 that creates a fiduciary duty.  Both Xu and WCM777 consented to judgment for
23 unlawfully selling securities in the SEC case.  As the court has noted, the definition of a
24 security, which is intentionally broadly defined because "[Congress] recognized the
25 virtually limitless scope of human ingenuity, especially in the creation of countless and
26 variable schemes devised by those who seek the use of the money of others on the
27 promise of profits." *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130
28 (1991) (Affirming the finding of promissory note scheme as an unlawful sale of

securities).  Even in the absence of a traditional relationship giving rise to a fiduciary duty "'the key factor in the existence of a fiduciary relationship lies in control by a person over the property or another." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.app.4th 226, 246, quoting *Vai v. Bank of America* (1961) 56 Cal.2d 329. The relationship of a client with an investment advisor is a recognized fiduciary relationship.  *Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517.  The relationship between a director and the company members is likewise a fiduciary relationship.  *American Trust Co. v. California Western States Life Ins. Co.*, 15 Cal.2d 42, 68 (Recognizing a fiduciary relationship between insurance company directors and insurance company member/policy holders.)

Xu marketed the WCM777 Ponzi scheme as an exclusive investment opportunity. "Investors can earn the cash and `points' by referring new members, or they can earn the cash and points passively based on the growth of the WCM777 business and its profits. The points have two uses: (1) they can be redeemed for goods and services to be offered by WCM777 and its affiliates, or (2) they can be also converted into equity in an initial public offering of a company named WCM7.com, or other unidentified `high tech' companies that Defendants claim they will bring public"[11] Clearly, the "investment" was dependent on WCM making a profit and creating new businesses in which the plaintiffs would hold equity.  Moreover, as the director of the company Xu had a fiduciary relationship with the WCM777 investor/members.

**B.     That WCM777 Was a Ponzi Scheme Establishes Both a Fiduciary Duty and Breach Thereof Under the Trust Fund Doctrine.**

Under California law the "trust-fund doctrine" imposes a fiduciary duty upon corporate directors and officers immediately upon the insolvency of the corporation, under certain additional circumstances. *Saracco Tank & Welding Co. v. Platz* (1944) 65 Cal.App.2d 306.  Imposition of a fiduciary duty under the "trust-fund doctrine" is limited

---

[11] SEC Complaint, ¶ 31; Xu Judgment.

1  to cases where directors or officers have diverted, dissipated or unduly risked the
2  insolvent corporation's assets. *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178
3  Cal.App.4th 1020, 1041.

4  Because WCM777 was a Ponzi scheme the trust fund doctrine is imposed on Xu.
5  As earlier stated, the SEC and Receiver's determination of WCM777 as a Ponzi scheme
6  demonstrates that WCM777 was insolvent at its inception.  Moreover, the fraudulent
7  diversion of corporate funds is at the very heart of the judgments against WCM777 and
8  Xu. Xu was the corporate insider of WCM777, a group of insolvent corporations.  He
9  diverted funds to himself and other insiders; this activity is subject to the trust-fund
10 doctrine, whether each victim knew him or not.

11 **VII.   THE PONZI SCHEME'S MESSAGE IN ITS INTERNET-BASED MARKETING**
12 **GOT THROUGH TO EACH PLAINTIFF**

13 The California Supreme Court has recognized that a fraud class action may be
14 proven without requiring each member to testify if it can be shown that the perpetrator
15 employed a mechanism for conveying the misrepresentation to potential victims.
16 *Vasquez v. Superior Court, supra.*, at p. 811-12.  Plaintiffs present evidence of such a
17 mechanism as well as evidence that the message got through to each plaintiff.

18 Plaintiffs present evidence that the Ponzi scheme broadcasted its misrepresentation
19 on its website, in power point presentations, and through social media.    Plaintiffs
20 presented evidence that the WCM777 mastermind, Phil Ming Xu, does not even deny
21 that he and it "falsely represented that WCM777 is and was a profitable enterprise, when
22 in fact it is a pyramid scheme with no source of revenue other than sales to investors, and
23 is not and was not deriving a profit from the sale of goods and services to third parties."[12]
24 Not only did Phil Ming Xu, not deny the allegations in the SEC complaint against him,
25 he affirmed that he ran "the Ponzi scheme that is the subject of this case," as part of a
26 declaration submitted in a related claw back case.  The complaint, which Phil Ming Xu
27
28

---

[12] Request for Judicial Notice, Ex. 1 SEC Complaint ¶ 47; Ex. 2, Xu Consent to Judgment.

**OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT**

did not deny, detailed that WCM777 "directly and indirectly, solicited investors through the website at WCM777.com, in-person seminars and presentations, webinars, and through the Internet such as through posts on message boards." Plaintiffs have also presented the declaration of a victim investor who solicited others to the investment, who stated that she was specifically instructed to presented WCM777 exactly as contained in the presentations and documents.[13] Obviously, the fact that WCM was actually a Ponzi scheme was concealed from each victim. Therefore, Plaintiffs have produced evidence of a mechanism employed by WCM777 that was intended to convey that it was a profitable company, and conceal that it was a Ponzi scheme, from all potential "investors."

HSBC USA asserts plaintiffs must have reasonably relied "on a misrepresentation by someone authorized to speak on behalf of WCM777 Limited. But, "[t]he law is well settled that `representations made to one person with intention that they will be repeated to another and acted upon by him and which are repeated and acted upon to his injury gives the person so acting the same right to relief as if the representations had been made to him directly. ... No reason appears why this same rule should not be applicable to nondisclosures as well as misrepresentations." *Massel v. Lettunich* (1967) 248 Cal.App.2d 68, 73; see also, *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, (2007) 157 Cal.App.4th 835. Plaintiffs have proffered evidence that WCM777 had an internet based marketing scheme that was intended to be repeated to all prospective "investors." The very fact that they were located on the internet serves as proof that they were meant to be conveyed to all victim investors.

HSBC USA argues that none of the lead plaintiffs reasonably relied on the misrepresentation, instead arguing that they knew they were investing in a Ponzi scheme. HSBC USA's cherry picked quotations notwithstanding, although inarticulate and perhaps lost in translation, each plaintiff testified that he thought WCM777 was a

---

[13] Declaration of Basilia Ayala ¶ 5.

legitimate, cloud based internet company. Each of the proposed lead plaintiffs spoke of attending meetings at which computer or internet presentations were shown to them. Each of them stated that they were told, and believed that the Ponzi scheme was actually a successful and prosperous company.  For example, Mr. Giron answered questions during his deposition as follows: "Q. What information did Mr. Ramirez show you at your first meeting? A. Well, he showed me on the internet the cloud of success, and he showed me how to invest. Q. Did Mr. Ramirez have pieces of paper or something else: A. No, just the computer. Q.  All right. So Mr. Ramirez showed you his computer? A. Yes. Q. And on his computer did he show you a website or something other than a website? A. No. He just showed me – well, he showed me how it worked.  How it worked. Q. But I'm trying to figure out what the actual document or screen shot or whatever he showed you. … Q. Do you understand what I'm after, sir? A. Well, he justed showed me what is the cloud of success and companies that were – well, he showed us the companies that were investing in like Holiday Inn, Siemens, many companies." (Giron Depo., p. 17 lines 9-25, p. 18 lines 1-14) While it is clear that these plaintiffs had virtually no understanding of the reality of cloud computing, the miniscule chance that an unknown company could make inroads into that arena, and the small likelihood that such a company would choose this type of financing, the fact remains that negligence on the part of the victim in failing to discover the falsity of a statement is no defense when the statement is intentional rather than negligent. *Whiteley v. Phillip Morris, Inc.* (2004) 117 Cal.App.4th 635, 684.  As the Supreme Court rather harshly reiterated long ago, "No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Seeger v. Odell* (1941) 18 Cal.2d 409, 415 (citations omitted).  WCM777 could not escape liability for its fraud to these victims on this basis and neither can HSBC USA for aiding and abetting that fraud.

## VIII.  UCL REMEDIES ARE AVAILABLE

HSBA USA seeks summary judgment as to the Unfair Competition Law claims made by the plaintiffs by asserting that no UCL remedies are available. HSBC USA

1   asserts that no injunctive relief is available because the Ponzi scheme is over and "[t]here
2   is no chance the alleged conduct will ever happen again."  HSBC USA's proclamation
3   that they will never let this happen again contradicts the history behind the Deferred
4   Prosecution Agreement, the facts in this case, and the statements of its own executives.
5   The Deferred Prosecution Agreement outlines years of repeated violations regarding
6   various anti-money laundering and trading with the enemy laws, and generally speaks
7   for itself.  However, the facts of this case speak to a glaring problem.  Although the newly
8   vamped anti-money laundering system worked in that it "caught" the WCM777 Ponzi
9   scheme as it began to use the HSBC USA wire transfer mechanism, HSBC USA failed
10   and continues to fail to acknowledge that it had knowledge of a likely Ponzi scheme
11   sufficient to warrant immediately discontinuing its services.  This screams for public
12   injunctive relief.

13          As the California Supreme Court has recently stated "public injunctive relief under
14   the UCL, . . . . is relief that has "the primary purpose and effect of" prohibiting unlawful
15   acts that threaten future injury to the general public."  *McGill v. Citibank, N.A.,* 2 Cal.
16   5th 945, 962 (2017).  Plaintiffs here seek such relief in the form of an Order that (1)
17   HSBC USA shall discontinue all services to any entity or person that it has determined
18   is likely engaged in fraud, (2) HSBC USA shall notify the correspondent bank
19   counterparty that has the direct relationship to the entity that it has determined the entity
20   to be likely engaging in fraud and (2) that for a period of 5 years HSBC USA report to
21   the Court under seal all such notifications of likely fraud to correspondent bank
22   counterparties.

23                                  **IX.  CONCLUSION**

24          Plaintiffs have presented evidence that an employee of the anti-money laundering
25   department of HSBC USA concluded that WCM777 was a Ponzi scheme on September
26   30, 2013.  Plaintiffs have also presented evidence that HSBC USA processed over $15
27   million worth of wire transfers after it knew that WCM777 was a Ponzi scheme.
28   Plaintiffs argue that the law allows for causation as to any victim who invested after

September 30, 2013, not just those whose money flowed through HSBC USA.  If the court deems that Plaintiffs showing is still insufficient, Plaintiffs request that the court defer considering the motion pursuant to FRCP § 56(d) to allow plaintiffs to obtain the underlying documents upon which Defendant basis its assertion that none of the Plaintiffs' money went through HSBC USA.  Plaintiffs previously requested such documentation and brought a motion to compel the same.  However, Plaintiffs were denied the opportunity to review the very internal documentation upon which Defendant bases its motion.

Dated: October 16, 2017                                    Respectfully Submitted,

                                              By:  /s/ Steven M. Nuñez
                                                    Steven M. Nuñez
                                                    WARD & HAGEN, LLP

                                                    Julio J. Ramos
                                                    LAW OFFICES OF JULIO J. RAMOS

                                                    Attorneys for Plaintiffs

OPPOSITION TO HSBC BANK USA, N.A.'s MOTION FOR SUMMARY JUDGMENT